UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

WAYNE BARNES,

                Plaintiff,

                                9:04-CV-1269
v.                              (NAM/GHL)

LT. CRAFT; SGT. J. O'KEEFE; C.O. C. HODGES;
and G. GOORD, Commissioner of the New York
State Department of Correctional Services,

                Defendants.
_____

APPEARANCES:                               OF COUNSEL:

WAYNE BARNES, No. D-62147
  Plaintiff, *Pro Se*
Bergen County Jail
P.O. Box 0369
Hackensack, NJ 07601

HON. ANDREW M. CUOMO             MICHAEL G. McCARTIN, ESQ.
Attorney General of the State of New York    Assistant Attorney General
  Counsel for Defendants
The Capitol
Albany, NY 12224

GEORGE H. LOWE, United States Magistrate Judge

## **REPORT-RECOMMENDATION**

       This action has been referred to me for Report and Recommendation by the Honorable

Norman A. Mordue, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and

Local Rule 72.3(c) of the Local Rules of Practice for this Court.  Wayne Barnes ("Plaintiff"),

while an inmate, commenced this *pro se* civil rights action on November 1, 2004, against four

employees of the New York State Department of Correctional Services ("Defendants"), pursuant

to 42 U.S.C. § 1983.  (Dkt. No. 9 [Plf.'s Am. Compl.].)  Generally, Plaintiff's Amended

Complaint alleges that Defendants violated his rights under the First, Eighth and Fourteenth

Amendments by confining him to the Special Housing Unit ("S.H.U.") at Ulster Correctional

Facility ("Ulster C.F.") between March 12, 2004, and March 17, 2004, without providing him a

hearing, in response to his refusal to shave his full beard, for which he claims he possessed, at the

time, a valid exemption issued by the New York State Department of Correctional Services

("DOCS") due to his need to maintain the beard in order to engage in Rastafarian spiritual

practices.  (*Id*.)  Currently pending before the Court is Defendants' motion for summary

judgment pursuant to Fed. R. Civ. P. 56. (Dkt. No. 43.)  For the reasons that follow, I

recommend that Defendants' motion be granted.

## I.   BACKGROUND

### A.   Plaintiff's Amended Complaint

Liberally construed, Plaintiff's Amended Complaint asserts the following factual

allegations, in pertinent part.

In late 2003, while Plaintiff was incarcerated in the New York State Department of

Correctional Services ("DOCS"), he was "passing through" Ulster Correctional Facility ("Ulster

C.F."), wearing a full beard.[1]  C.O. Hodes[2] stopped Plaintiff and ordered him to shave his beard.[3]

---

[1]      (Dkt. No. 9, ¶ 7(a) [Plf.'s Am. Compl.].)

[2]      I note that, although Plaintiff's Amended Complaint refers to this individual as "C.O. C. Hodges" (Dkt. No. 9), Defendants have previously identified this individual as "C.O. Hodes" (Dkt. No. 19, Part 2 at 1 [Defs.' Mem. of Law in Support of Motion to Dismiss]), and Plaintiff has previously requested that the Court amend his Amended Complaint accordingly (Dkt. No. 22, at 10 [Plf.'s Mem. of Law in Opp. to Motion to Dismiss]).

[3]      (Dkt. No. 9, ¶ 7(a) [Plf.'s Am. Compl.].)

2

Plaintiff informed C.O. Hodes that he had received a written permit from DOCS exempting him from DOCS' rule that beards may be no more than one inch in length (hereinafter "DOCS' one-inch beard rule").[4]  C.O. Hodes called Wyoming C.F. (the correctional facility at which Plaintiff was regularly housed, and which was responsible for maintaining Plaintiff's records at the time), and was informed that Plaintiff indeed had such a written exemption on file.[5]  As a result, C.O. Hodes permitted Plaintiff to pass through Ulster C.F. without having to shave his beard.[6]

Then, during the afternoon of March 12, 2004, while again passing through Ulster C.F., Plaintiff was again stopped by C.O. Hodes and ordered to shave his beard.[7]  Plaintiff asked C.O. Hodes whether he did not remember Plaintiff from the previous time he had passed through Ulster C.F.[8]  Plaintiff explained that he was the inmate who had received a written exemption from DOCS' one-inch beard rule.[9]  C.O. Hodes responded that, at Ulster C.F., a permit does not matter and that if Plaintiff did not cut his beard he would have to go to the "box" until he cut it.[10]  Despite having been given a copy of the written exemption (by an unidentified person at an unidentified point in time), and knowing that Plaintiff was exempt from DOCS' one-inch beard

---

[4]  (*Id*. at ¶ 7(a).)

[5]  (*Id*.)

[6]  (*Id*.)

[7]  (*Id*. at ¶ 7(a) & Exs. 1, 2 [attaching "Administrative Segregation Recommendation" dated 3/12/04, and complaint letter from Plaintiff dated 4/13/04].)

[8]  (*Id*. at ¶ 7(a).)

[9]  (*Id*.)

[10]  (*Id*.)

rule regarding beards, C.O. Hodes sought to incarcerate Plaintiff in the "box" at Ulster C.F.[11]

Toward this end, C.O. Hodes called Sgt. O'Keefe and informed him that Plaintiff was refusing to cut his beard and claiming that he had an exemption on file due to the fact that he was a "practicing and registered Rastafarian."[12]  Plaintiff informed Sgt. O'Keefe that previously, when Plaintiff had been passing through Ulster. C.F., C.O. Hodes had learned that Plaintiff did indeed have an exemption on file.[13]  Plaintiff also informed Sgt. O'Keefe that the Ulster C.F. "Intake Draft" has a copy of the permit from DOCS in Albany, New York.[14]  Sgt. O'Keefe responded that, at Ulster C.F., a permit from Albany holds no weight and that if Plaintiff continued to refuse to cut his beard he would be sent to Ulster C.F.'s Special Housing Unit ("S.H.U.") until he cut his beard, regardless of any such permit.[15]

As a result, at approximately 3:40 p.m. on March 12, 2004, Sgt. O'Keefe signed an "Administrative Segregation Recommendation," stating that the reason for his recommendation was that "[Plaintiff] refused to shave his beard to one inch during the incoming draft process. [Plaintiff] claims he has an exemption on file."[16]  At some point thereafter, Lt. Craft signed the "Administrative Segregation Recommendation," authorizing Plaintiff's confinement in S.H.U.

---

[11]       (*Id.*)

[12]       (*Id.* at ¶ 7(b) & Ex. 2 [attaching complaint letter from Plaintiff dated 4/13/04].)

[13]       (*Id.* at ¶ 7(b).)

[14]       (*Id.* at ¶ 7(a), (b).)

[15]       (*Id.* at ¶ 7(b).)

[16]       (*Id.* at Ex. 1 [attaching "Administrative Segregation Recommendation" dated 3/12/04].)

pending a hearing on the recommendation.[17]   The bottom of the "Administrative Segregation"

Recommendation" form stated as follows:

> **Notice to Inmate:** A hearing will be conducted within 14 days of this
> recommendation in accordance with the provisions of Part 254 of
> Chapter V.  You will be entitled to call witnesses on your own behalf,
> provided that doing so does not jeopardize institutional safety or
> correctional goals.
>
> If restricted pending a hearing on this recommendation, you may write
> to the Deputy Superintendent for Security or his/her designee prior to
> the hearing to make a statement on the need for continued
> confinement.[18]

Between March 12, 2004, and March 17, 2004, Plaintiff remained in the Ulster C.F.

S.H.U., during which time he was subjected to the following restrictive conditions, among

others: the continuous confinement in his cell, the continuous isolation from the general prison

population, the continuous denial of use of prison facilities (such as the libraries, gym, etc.), and

sleep deprivation due to the 24-hour lighting in his cell and the loud noise of the air-conditioning

system above his cell.[19]

On March 17, 2004, Plaintiff sent a letter of complaint to an unidentified person at Ulster

C.F., complaining about the harsh conditions to which he was being subjected in S.H.U.[20]

Plaintiff alleges that he sent this letter to "the hearing officer" (and/or perhaps to an unspecified

---

[17]        (*Id*.)

[18]        (*Id*.)

[19]        (*Id*. at ¶¶ 5, 7 & Exs. 2, 4 [attaching complaint letter from Plaintiff dated 4/13/04,
and a letter from Plaintiff dated 5/23/04].)

[20]        (*Id*. at Ex. 4 [attaching letter from Plaintiff dated 5/23/04].)  I note that Plaintiff
does not attach to his Amended Complaint a copy of this March 17, 2004, letter.

lieutenant),[21] although he acknowledges that no hearing had yet been held.[22]  Plaintiff never

received a response to his letter.[23]  However, on or about March 17, 2004, Plaintiff was released

from S.H.U. and returned to Wyoming C.F.[24]  No hearing was ever held.[25]

Although Plaintiff's Amended Complaint references only the First Amendment (in

asserting a retaliation claim), I liberally construe that pleading as attempting to raise an

inadequate prison-conditions claim under the Eighth Amendment, and a procedural due process

claim under the Fourteenth Amendment, given his special status as a *pro se* civil rights litigant,

and given various of the statements made in his Amended Complaint and documents attached to

that pleading.[26]

---

[21]     (*Id*. at Exs. 4, 6 [attaching letter from Plaintiff dated 5/23/04 alleging that he sent
the 4/17/04 letter to "the hearing officer (Lt./etc.)" and letter from Plaintiff dated 6/16/04 alleging
that he sent the 4/17/04 letter to "the 'hearing officer'"].)

[22]     (*Id*. at Ex. 4 [attaching letter from Plaintiff dated 5/23/04 alleging that he sent the
4/17/04 letter "prior to a hearing"].)

[23]     (*Id*. at Exs. 4, 6 [attaching letter from Plaintiff dated 5/23/04 stating *inter alia* "I
have yet to have . . . a response from the hearing officer regarding this issue," and letter from
Plaintiff dated 6/16/04 stating *inter alia* "I have never gotten a response from the hearing
officer"].)

[24]     (*Id*. at Exs. 2, 4, 6 [attaching complaint letter from Plaintiff dated 4/13/04, letter
from Plaintiff dated 5/23/04, and letter from Plaintiff dated 6/16/04].)

[25]     (*Id*. at ¶¶ 5, 7(c) & Ex. 4 [attaching letter from Plaintiff dated 5/23/04].)

[26]     (*See*, *e.g.*, *id*. at ¶ 5 & Ex. 4 [attaching his letter dated 5/23/04, complaining that
there was "no hearing" with regard to his confinement in the Ulster C.F. S.H.U.]; *id*. at Exs. 2 &
4 [attaching his letters dated 4/13/04 and 5/23/04, complaining about the allegedly "harsh,"
"degrading" and "inhumane" conditions in the Ulster C.F. S.H.U.].)

**B.      Defendants' Motion for Summary Judgment**

Defendants argue that the Court should grant their motion for summary judgment for six

reasons: (1) Plaintiff's Fourteenth Amendment procedural due process claim should be dismissed

because he has failed to establish that his six-day stay in administrative segregation created a

sufficient liberty interest to give rise to such a claim; (2) Plaintiff's Eighth Amendment claim of

inadequate prison conditions should be dismissed because he has failed to establish either that he

experienced a sufficiently serious deprivation or that Defendants acted with a sufficiently

culpable state of mind; (3) Plaintiff's First Amendment retaliation claim should be dismissed

because he failed to establish that the adverse action allegedly taken against him was anything

more than *de minimis* in nature; (4) in the alternative, Plaintiff's claims against Defendants Goord

and Craft should be dismissed because Plaintiff has failed to establish that they were personally

involved in the constitutional violations alleged; (5) in the alternative, Plaintiff's claims against

all Defendants should be dismissed because, based on the current record, they are protected from

liability by the doctrine of qualified immunity, as a matter of law; and (6) in the alternative,

Plaintiff's action should be dismissed under Local Rule 41.2(b) of the Local Rules of Practice for

this Court because of Plaintiff's failure to keep the Court apprised of his current address.  (Dkt.

No. 43, Part 12 [Defs.' Mem. of Law].)

Plaintiff has opposed Defendants' motion.  (Dkt. No. 48.)

**II.      RELEVANT LEGAL STANDARD**

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether a genuine issue of material[27] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party.[28]

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial."[29] The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts."[30] Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[31]

It should be noted that, where a non-movant fails to adequately oppose a properly

---

[27]    A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

[28]    *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) [citation omitted]; *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990) [citation omitted].

[29]    Fed. R. Civ. P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations . . . of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the [plaintiff] does not so respond, summary judgment, if appropriate, shall be entered against the [plaintiff]."); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986).

[30]    Fed. R. Civ. P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations . . . of the [plaintiff's] pleading . . . ."); *Matsushita*, 475 U.S. at 585-86; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

[31]    *Ross v. McGinnis*, 00-CV-0275, 2004 WL 1125177, at *8 (W.D.N.Y. Mar. 29, 2004) [internal quotations omitted] [emphasis added].

supported factual assertion made in motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute.[32]  Moreover, to be sufficient to create a factual issue for purposes of a summary judgment motion, statements made in an affidavit or deposition testimony must (among other things) not be conclusory.[33]  Such statements are conclusory if, for example, their assertions lack any supporting evidence or are too general.[34]

---

[32]    *See Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470 (2d Cir. 2002) ("We agree with those circuits that have held that Fed. R. Civ. P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") [citations omitted]; *accord*, *Lee v. Alfonso*, No. 04-1921, 2004 U.S. App. LEXIS 21432 (2d Cir. Oct. 14, 2004), *aff'g*, 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N.Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak*, 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell*, 289 F. Supp.2d 289, 295 (N.D.N.Y. Oct. 29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan*, 253 F. Supp.2d 369, 371-372 (N.D.N.Y. 2003) (Hurd, J.).

[33]    *See* Fed. R. Civ. P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson*, 375 F.3d at 219 (2d. Cir. 2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate v. Top Assoc.*, 425 F.2d 92, 97 (2d Cir. 1970) (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

[34]    *See, e.g.*, *Bickerstaff v. Vassar Oil*, 196 F.3d 435, 452 (2d Cir. 1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.*, 78 F.3d 61, 63 (2d Cir. 1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon*, 759 F.2d 989, 997 (2d Cir. 1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places. . . .  It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e]), *cert. denied*, 474 U.S. 829 (1985); *Applegate*, 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

III.     **ANALYSIS**

A.      **Whether Plaintiff's Fourteenth Amendment Procedural Due Process Claim Should Be Dismissed Because He Has Failed to Establish that His Six-Day Stay in Administrative Segregation Created a Sufficient Liberty Interest to Give Rise to Such a Claim**

In 1995, the Supreme Court held in *Sandin v. Connor* that liberty interests protected by the Fourteenth Amendment's Due Process Clause "will generally be limited to freedom from restraint which . . . imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Connor*, 515 U.S. 472, 483-484 (1995). Defendants argue that the short duration of Plaintiff's stay in Administrative Segregation at Ulster C.F., coupled with the rather ordinary conditions of that segregated confinement, do not create a sufficient liberty interest to give rise to a Fourteenth Amendment procedural due process claim. (Dkt. No. 43, Part 12, at 2-6 [Defs.' Mem. of Law].)

Plaintiff responds with a three-part argument: (1) he possessed a protected liberty interest because he possessed a valid DOCS-issued beard exemption when he was placed in administrative segregation; (2) he need not show *Sandin v. Connor*'s "atypical and significant hardship" requirement because the injury that he experienced consisted of the retaliatory conduct itself; and (3) in any event, his stay in Administrative Segregation imposed an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life" because (a) the conditions of his stay in Administrative Segregation were sufficiently harsh, and (b) those conditions were not "ordinary" to him since he was otherwise incarcerated in the general population of a medium-security correctional facility. (Dkt. No. 48, at 15-16 [Pages 14 and 15 of Plf.'s Response Mem. of Law].)

10

With respect to Plaintiff's first argument, the fact that he possessed a DOCS-issued beard exemption does not create a protected liberty interest for purposes of a procedural due process claim. *Lee v. Quillar,* 04-CV-1203, 2007 U.S. Dist. LEXIS 50894, at *5-7 (E.D. Cal. July 13, 2007) (recommending dismissal of prisoner's procedural due process claim arising from disciplinary charge that he failed to cut his beard, even though charge contravened medical authorization permitting prisoner to wear beard), *adopted by*, 2007 U.S. Dist. LEXIS 61480 (E.D. Cal. Aug. 16, 2007).[35]  This is because, in 1995, the United States Supreme Court shifted a court's focus, when conducting a procedural due process analysis, from the language of the particular authority allegedly giving rise to the protected liberty interest alleged (e.g., a state law or regulation) to the nature of the deprivation alleged.  *Sandin v. Connor*, 515 U.S. 472, 483-84 (1995).[36]  Specifically, as stated earlier, in 1995, the Supreme Court held that a liberty interest protected by the Fourteenth Amendment's Due Process Clause will generally be limited to freedom from a restraint that "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  *Sandin*, 515 U.S. at 483-84.

Before continuing to Plaintiff's second argument, a few words are appropriate about any

---

[35]     *See also Darvie v. Countryman*, 08-CV-0715, 2008 U.S. Dist. LEXIS 52797, at *2, 14-21 (N.D.N.Y. July 10, 2008) (Lowe, M.J.) (recommending dismissal of prisoner's procedural due process claim arising from disciplinary charge and conviction–even assuming disciplinary charge had been issued in contravention of medical permit–since deprivation following conviction did not result in an atypical and significant hardship).

[36]     *See also Blouin v. Spitzer*, 356 F.3d 348, 362-363 (2d Cir. 2004) (recognizing abrogation or modification of prior rule which focused on language of state regulation), *accord*, *Anderson v. Recore*, 317 F.3d 194, 198-200 (2d Cir. 2003), *accord*, *Watson v. City of N.Y.*, 92 F.3d 31, 37-38 (2d Cir. 1996), *accord*, *Frazier v. Coughlin*, 81 F.3d 313, 317 (2d Cir. 1996).

*substantive* due process claim he may be trying to assert in his Amended Complaint.[37]  As an

initial matter, I do not liberally construe Plaintiff's Amended Complaint (which essentially

challenges the way DOCS' beard policy was implemented) as alleging a violation of his right to

*substantive* due process.[38]  Even if I were to so construe Plaintiff's Amended Complaint, I would

have difficulty finding that the issuance of a DOCS' beard exemption (without the issuance of a

court order) created such a right of substantive due process.  *See Johnson v. Coughlin*, 90-CV-

1731, 1997 WL 431065, at *6, 1997 U.S. Dist. LEXIS 11025, at *19-20 (S.D.N.Y. July 30,

1997) ("A prison official's knowing refusal to obey a state court order affecting a prisoner's rights

would make that official liable for infringing upon the inmate's personal liberty protected by the

---

[37]       The Due Process Clause of the Fourteenth Amendment contains both a
substantive component and a procedural component.  *Zinernon v. Burch*, 494 U.S. 113, 125
(1990).  The substantive component "bars certain arbitrary, wrongful government actions
regardless of the fairness of the procedures used to implement them."  *Zinernon*, 494 U.S. at 125
[internal quotations marks and citation omitted].  The procedural component bars "the
deprivation by state action of a constitutionally protected interest in life, liberty, or property . . .
*without due process of law*."  *Id*. at 125-26 [internal quotations marks and citations omitted;
emphasis in original].  One of the differences between the two claims is that a substantive due
process violation "is complete when the wrongful action is taken," while a procedural due
process violation "is not complete unless and until the State fails to provide due process" (which
may occur *after* the wrongful action in question).  *Id*.

[38]       Setting aside the lack of factual allegations in Plaintiff's Amended Complaint
plausibly suggesting a substantive due process claim, I note that, as the Supreme Court has
repeatedly held, "if a constitutional claim is covered by a specific constitutional provision, such
as the . . . Eighth Amendment, the claim must be analyzed under the standard appropriate to that
specific provision, not under the [more generalized notion] of substantive due process."  *United
States v. Lanier*, 520 U.S. 259, 272, n.7 (1997) (citing *Graham v. Connor*, 490 U.S. 386, 392-94
[1989]).  Here, Plaintiff's failure-to-honor-his-beard-exemption claim is more appropriately
analyzed as a First Amendment retaliation claim, an Eighth Amendment inadequate-prison-
conditions claim, and/or a Fourteenth Amendment procedural due process claim.  Thus, there is
no need to analyze that claim as a Fourteenth Amendment substantive due process claim.

substantive due process clause of the Fourteenth Amendment.").[39]

Furthermore, even if I were able to find that the issuance of a DOCS' beard exemption alone created such a right of substantive due process, I would have difficulty finding evidence in the record that Defendants' actions were not simply "incorrect or ill-advised" but were "arbitrary, . . . conscience-shocking, . . . or oppressive in a constitutional sense." *Lawrence v. Achtyl*, 20 F.3d 529, 537 (2d Cir. 1994) [internal quotations marks and citations omitted], *aff'g*, 91-CV-1196, *Memorandum-Decision and Order* (N.D.N.Y. Jan. 26, 1993) (DiBianco, M.J.) (granting summary judgment to defendants in inmate's civil rights action).  I note that prison beard-length policies generally appear to have a legitimate penological objective–whether it be to facilitate inmate identification, prevent hygiene problems, or minimize the need for contact between guards and the inmate during searches.[40]  Here, the record indicates that accurate identification was one of the penological objectives of the beard-length policy in question.[41]

With respect to Plaintiff's second argument, I have found no cases suggesting that *Sandin*'s atypicality requirement is automatically satisfied when a prisoner has been subjected to retaliation.  Rather, in every on-point case I have found (in my non-exhaustive search), courts

---

[39]     *Cf. Young v. Goord*, 192 F. App'x 31, 33 (2d Cir. 2006) ("[I]t is at least reasonable to read Rule 110.32 [the DOCS regulation governing inmates' beard length, which permits DOCS-issued exemptions] *not* to create a substantive right to a religious exemption from the beard-length policy . . . .") [emphasis in original].

[40]     *Cf. Singh v. Goord*, 520 F. Supp.2d 487, 507 (S.D.N.Y. 2007) ("[N]umerous courts have held that Directive 4914's initial shave requirement serves a legitimate penological interest in maintaining prison security and a record of prisoners' appearances in case of escape.") [collecting cases].

[41]     (Dkt. No. 43, Part 5, at 2 [Ex. C to McCartin Decl., attaching Directive 4914, stating, "It is the purpose of this directive to ensure that inmate appearance will be regulated sufficiently to maintain accurate identification of each individual"].)

have considered allegations (and evidence) of retaliation *separately* from allegations (and evidence) of due process violations.[42]

With regard to Plaintiff's third argument, the fact that the conditions of his Administrative Segregation were restrictive, and the fact that he "ordinarily" was incarcerated in the general population of a medium-security correctional facility, do not, in and of themselves, create a question of fact regarding whether his stay in Administrative Segregation, coupled with the conditions of that segregated confinement, gave rise to a Fourteenth Amendment claim. Rather, in determining whether Plaintiff's six-day stay in Administrative Segregation imposed an "atypical and significant hardship on [him] in relation to the ordinary incidents of prison life," the Court must determine what the conditions of that six-day Administrative Segregation were, as established by the record evidence, and then compare the imposition of those conditions for six days to "the ordinary incidents of prison life."

Here, Plaintiff has adduced at least *some* record evidence that, during the time in

---

[42]      *See*, *e.g.*, *Wells v. Wade*, 36 F. Supp.2d 154, 158-59 (S.D.N.Y. 1996) (finding that evidence did *not* exist that plaintiff experienced atypical and significant hardship, due to placement in pre-hearing keeplock confinement, for purposes of due process claim, but that evidence *did* exist that defendant took adverse action against plaintiff, by causing him to be placed in pre-hearing keeplock confinement, because he engaged in protected activity for purposes of retaliation claim); *Watson v. Norris*, 07-CV-0102, 2007 WL 4287840, at *3-5 (E.D. Ark. Dec. 7, 2007) (finding that prisoner's allegations, arising from placement in segregated housing, did *not* plausibly suggest atypical and significant hardship for purposes of due process claim, but that his allegations–arising from same placement in segregated housing–*did* plausibly suggest that defendants took adverse action against him because he engaged in protected activity for purposes of retaliation claim); *Harris v. Hulkoff*, 05-CV-0198, 2007 WL 2479467, at *4-5 (W.D. Mich. Aug. 28, 2007) (first considering whether evidence existed that plaintiff experienced atypical and significant hardship, due to placement on suicide watch, for purposes of due process claim, and *then* considering whether evidence existed that defendants took adverse action against plaintiff, by placing him on suicide watch, because he engaged in protected activity for purposes of retaliation claim).

question, he experienced the following conditions of confinement.  First, prior to entering his cell
in S.H.U. on March 12, 2004, Plaintiff was strip searched and "handled very rigorously . . . ."
(Dkt. No. 43, Part 3, at 33-34 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans.].)  Plaintiff
was told that, if he took his hands off the wall, he would "be beaten up[,] but not [in] those
words."  (*Id*. at 34.)

Second, during his confinement in Administrative Segregation, from March 12, 2004, to
March 17, 2004, Plaintiff was alone in his cell, and he never left his cell.  (Dkt. No. 43, Part 3, at
33, 36 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans.].)  He was locked in his cell twenty-
four (24) hours a day for all six days he spent in Administrative Segregation.  (*Id*. at 39.)  In
addition, Plaintiff did not participate in recreation period, nor was he afforded the opportunity to
shower.  (*Id*. at 38-39; *see also* Plf.'s Decl. in Opp., ¶ 25.)

Third, Plaintiff's cell in Administrative Segregation was approximately five feet by ten
feet in size.  (Dkt. No. 43, Part 3, at 35 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans.].)  It
contained one bed, one toilet, and no shower.  (*Id*.)  The lights were on in the cell twenty-four
(24) hours a day.  (*Id*. at 37.)  What Plaintiff thinks was an "air-conditioning system" made a loud
noise almost constantly that vibrated the cell.  (*Id*.)  While in the cell, Plaintiff was "deprived of
sleep" and he felt "claustrophobic."  (Plf.'s Decl. in Opp., ¶ 25.)

Fourth, although it was wintertime, the cell was "very hot" and "too hot."  (Dkt. No. 43,
Part 3, at 37 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans.]; Plf.'s Decl. in Opp., ¶ 25.)  If
the window was open, the cell would feel too cold to Plaintiff.  (Dkt. No. 43, Part 3, at 38 [Ex. A
to McCarin Decl., attaching Plf.'s depo. trans.]; Plf.'s Decl. in Opp., ¶ 25.)  Plaintiff felt
comfortable only when wearing just a t-shirt, although "it still would be too humid."  (Dkt. No.

43, Part 3, at 38 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans.].)

Fifth, during his six-day stay in Administrative Segregation, Plaintiff "never received any medical attention."  (Dkt. No. 48, Plf.'s Decl. in Opp., ¶ 25.)

Sixth, and finally, during his confinement in Administrative Segregation, Plaintiff possessed his "State[-issued] green[] clothing]," received three meals a day, and was permitted to mail at least one letter.  (Dkt. No. 43, Part 3, at 36, 38 [Exhibit A to McCarin Decl., attaching Plf.'s depo. trans.]; Plf.'s Decl. in Opp., ¶ 21.)

No record evidence exists that, during the six-day period at issue, Plaintiff was subjected to any substandard cell conditions (e.g., regarding bedding, cleanliness, etc.), or poor treatment (e.g., unwarranted searches, beatings, denial of meals, etc.), other than the previously described conditions and poor treatment.  (*See* Plf.'s Decl. in Opp., ¶ 25; Dkt. No. 43, Part 3, at 39-40 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans.].)

Under these circumstances, I find that no record evidence exists that the duration and conditions of Plaintiff's stay in Administrative Segregation at Ulster C.F. created a protected liberty interest to give rise to a Fourteenth Amendment due process claim.  Generally, the conditions experienced by Plaintiff in Administrative Segregation were the same as, or perhaps slightly more harsh than, the conditions ordinarily experienced in disciplinary confinement in a correctional facility within the New York State DOCS.[43]  *See Colon v. Howard*, 215 F.3d 227, 230 (2d Cir. 2000) (describing the following conditions as "normal" conditions of SHU

---

[43]    I note that, in his deposition, Plaintiff testified that he had "spoken to several prisoners of the treatment you get [in S.H.U. confinement]" and that he "was subject to . . . that type of treatment."  (Dkt. No. 43, Part 3, at 34 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans.].)

confinement in New York: "Colon was placed in a solitary confinement cell, kept in his cell for

23 hours a day, permitted to exercise in the prison yard for one hour a day . . ., limited to two

showers a week, and denied various privileges available to general population prisoners, such as

the opportunity to work and obtain out-of-cell schooling.  Visitors were permitted, but the

frequency and duration was less than in general population.  The number of books allowed in the

cell was also limited.  As to duration, Colon was required to serve 305 days of the 360-day

sentence imposed.") (citing 7 N.Y. Comp. Codes R. & Regs. §§ 304.1-304.14).

Finally, numerous courts in this Circuit have issued well-reasoned decisions finding no

atypical and significant hardship experienced by inmates who served sentences in a Special

Housing Unit ("S.H.U.") of *far* more than six (6) days, even where the conditions of confinement

in the Special Housing Unit were, to varying degrees, more restrictive than those in the prison's

general population.  *See, e.g., Sealey v. Giltner*, 197 F.3d 578, 589-590 (2d Cir. 1999) (101 days

of disciplinary confinement in SHU under conditions that were "doubtless unpleasant and

*somewhat more severe than those of general population*" did not rise to the level of atypicality)

[emphasis added].[44]  Several of those cases have also recognized (1) the fact that restrictions

---

[44]       *See also Spence v. Senkowski,* 91-CV-0955, 1998 WL 214719, at *3 (N.D.N.Y.
Apr. 17, 1998) (McCurn, J.) (180 days that plaintiff spent in S.H.U., where he was subjected to
numerous conditions of confinement that were more restrictive than those in general population,
did not constitute atypical and significant hardship in relation to ordinary incidents of prison
life); *accord, Husbands v. McClellan*, 990 F. Supp. 214, 217-19 (W.D.N.Y. 1998) (180 days in
S.H.U. under numerous conditions of confinement that were more restrictive than those in
general population); *Warren v. Irvin*, 985 F. Supp. 350, 353-56 (W.D.N.Y. 1997) (161 days in
S.H.U. under numerous conditions of confinement that were more restrictive than those in
general population); *Ruiz v. Selsky*, 96-CV-2003, 1997 WL 137448, at *4-6 (S.D.N.Y. 1997)
(192 days in S.H.U. under numerous conditions of confinement that were more restrictive than
those in general population); *Horne v. Coughlin*, 949 F. Supp. 112, 116-17 (N.D.N.Y. 1996)
(Smith, M.J.) (180 days in S.H.U. under numerous conditions of confinement that were more
restrictive than those in general population); *Nogueras v. Coughlin*, 94-CV-4094, 1996 WL

(such as the amount of time allowed out of one's cell to exercise and the number of showers

allowed per week) are placed even on inmates in the general population,[45] and (2) the fact that a

sentence in S.H.U. is a relatively common and reasonably expected experience for an inmate in

the general population of a New York State correctional facility.[46]

 For all of these reasons, I recommend that the Court dismiss Plaintiff's Fourteenth

---

487951, at *4-5 (S.D.N.Y. Aug. 27, 1996) (210 days in S.H.U. under numerous conditions of
confinement that were more restrictive than those in general population); *Carter v. Carriero*, 905
F. Supp. 99, 103-04 (W.D.N.Y. 1995) (270 days in S.H.U. under numerous conditions of
confinement that were more restrictive than those in general population).

 [45] *See, e.g., Husbands*, 990 F. Supp. 218-19 ("The conditions of confinement in
SHU also are not dramatically different from those experienced in the general population.  For
example, as stated previously, all inmates in SHU are allowed one hour of outdoor exercise daily.
[7 NYCRR] § 304.3.  This is the same amount of time allotted for exercise to general population
inmates, *id.* § 320.3(d)(2), and is in full compliance with constitutional requirements. . . .  SHU
inmates are allowed a minimum of two showers per week, 7 NYCRR § 304.5(a), while general
population inmates are allowed three showers per week, id. § 320.3(d)(1).  SHU inmates are
confined to their cells approximately twenty-three hours a day.  General population inmates are
confined to their cells approximately twelve hours a day during the week and even more on the
weekends. . . .  Thus, conditions at New York correctional facilities involve a significant amount
of lockdown time even for inmates in the general population."); *accord*, *Warren*, 985 F. Supp. at
354-55; *see also Ruiz*, 1997 WL 137448, at *5 ("Indeed, the conditions at Halawa [prison]
involve significant amounts of 'lockdown time' even for inmates in the general population.
Based on a comparison between inmates inside and outside disciplinary segregation, the State's
actions in placing him there for 30 days did not work a major disruption in his environment.").

 [46] *See, e.g., Husbands*, 990 F. Supp. 217 ("[The plaintiff] was convicted of a drug-
related crime and was serving an indeterminate sentence of six years to life at the time of the
events in question.  With respect to the duration of his confinement in SHU, [the plaintiff] spent
six months there.  Lengthy disciplinary confinement is prevalent in New York State prisons.  In
fact, New York law imposes no limit on the amount of SHU time that may be imposed for Tier
III infractions.  7 NYCRR § 254.7(a)(1)(iii).  As of March 17, 1997, there were 1,626 inmates in
SHU for disciplinary reasons. . . .  Of those inmates, 28 had SHU sentences of 59 days or less;
129 had SHU sentences of 60-119 days; 127 had SHU sentences of 120-179 days; 545 had SHU
sentences of 180-365 days; and 797 had SHU sentences exceeding 365 days.  These statistics
suggest that lengthy confinement in SHU–for periods as long as or longer than [the plaintiff's
180-day] stay–is a normal element of the New York prison regime."); *accord*, *Warren*, 985 F.
Supp. at 354.

Amendment due process claim.

> **B.      Whether Plaintiff's Eighth Amendment Claim of Inadequate Prison Conditions Should Be Dismissed Because He Has Failed to Establish Either that He Experienced a Sufficiently Serious Deprivation or that Defendants Acted with a Sufficiently Culpable State of Mind**

Generally, to prevail on a claim of inadequate prison conditions, a plaintiff must demonstrate two things: (1) that the conditions of his confinement resulted in deprivation that was *sufficiently serious*; and (2) that the defendant acted with *deliberate indifference* to the plaintiff's health or safety.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Davidson v. Murray*, 371 F. Supp.2d 361, 370 (W.D.N.Y. 2005).

To satisfy the seriousness requirement, a plaintiff must demonstrate that the conditions of his confinement deprived him of "the minimal civilized measure of life's necessities" or an "unquestioned and serious deprivation of basic human needs."  *Farmer*, 511 U.S. at 834; *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).  As the Supreme Court has rather famously observed, "[T]he Constitution does not mandate comfortable prisons," and "conditions [that] are restrictive and even harsh . . . are part of the penalty that criminal offenders pay for their offenses against society."  *Rhodes*, 452 U.S. at 347, 349.

To satisfy the deliberate-indifference requirement, a plaintiff must demonstrate that the defendants acted with a state of mind of "deliberate indifference to inmate health or safety . . . ."[47] This means a state of mind "more blameworthy than negligence."[48]  Rather, it means that the defendant "knows of and disregards an excessive risk to inmate health or safety; the official must

---

[47]      *Farmer*, 511 U.S. at 834.

[48]      *Id*. at 835.

both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."[49]  In other words, "this standard requires that only the deliberate infliction of punishment, and not an ordinary lack of due care for prisoner interests or safety, leads to liability."[50]

### 1.     Sufficient Seriousness

Here, I find no record evidence that the conditions of Plaintiff's six-day stay in Administrative Segregation were *sufficiently serious* for purposes of the Eighth Amendment in that they deprived him of *the minimal civilized measure of life's necessities*, such as food, water, or a toilet.  To the contrary, Plaintiff testified in his deposition that his cell contained "the bare necessities."  (Dkt. No. 43, Part 3, at 35 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans.].)  For example, he testified that his cell was equipped with a toilet, a bed, lights, heat, an "air-conditioning system," and a window.  (*Id*. at 35, 37-38.)  In addition, he testified that he possessed a t-shirt and his "State[-issued] greens"; he received three meals a day; and he was able to mail a letter.  (*Id*. at 36, 38; *see also* Dkt. No. 48, Plf.'s Decl. in Opp., ¶ 21.)

Granted, Plaintiff has adduced some evidence that, during the six-day time period, he was denied the opportunity to exercise outside, the ability to shower, and (when his window was open) a certain degree of warmth.  (Dkt. No. 43, Part 3, at 35, 38-39 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans.]; Dkt. No. 48, Plf.'s Decl. in Opp., ¶ 25.)  However, these deprivations for six days were simply not sufficiently severe and prolonged to rise to the level of

---

[49]     *Id*. at 837.

[50]     *Blyden v. Mancusi*, 186 F.3d 252, 263 (2d Cir. 1999) (citing *Farmer*, 511 U.S. at 841).

an Eighth Amendment violation.  *See Trammel v. Keane*, 338 F.3d 155, 158-159, 164 (2d Cir.

2003) (affirming grant of defendants' motion for summary judgment dismissing Eighth

Amendment claim based on [1] deprivation of all property except one pair of undershorts and [2]

exposure to "bitter cold," because the temperatures to which inmate was exposed were not cold

enough, and the period of time in which he was deprived of clothing–seventeen days–was not

long enough); *Scot v. Merola*, 555 F. Supp. 230, 231-234 (S.D.N.Y. 1983) (granting defendants'

Rule 12[b][6] motion to dismiss inmate's Eighth Amendment claim based on his incarceration

for three-and-a-half months on Rikers Island in housing area without heat where windows were

broken, and temperature dropped below fifty degrees).[51]

      Furthermore, Plaintiff has adduced evidence that he "never received any medical

attention."  (Dkt. No. 48, Plf.'s Decl. in Opp., ¶ 25.)  However, he has not adduced evidence that

(1) he needed such attention or (2) he requested such attention.  (*Id*.)  As a result, he has adduced

no evidence that, during the time in question, either (1) medical attention was, to him, one of

"life's necessities," or (2) he was *denied* such attention after requesting it.  *Trammell*, 338 F.3d at

164 ("Although Trammell's requests to be taken from his cell for medical evaluation were not

granted, the record shows that the defendants were mindful of, not indifferent to, his health and

ensured that his basic 'health or safety' was not at risk.").

      For these reasons, I recommend that the Court dismiss Plaintiff's Eighth Amendment

---

    [51]     *See also Lock v. Clark*, 90-CV-0327, 1992 U.S. Dist. LEXIS 21991, at *1, 11-12
(N.D. Ind. March 17, 1992) ("The deprivations alleged by Mr. Lock in this case [which consisted
of being confined for seven days in a "strip cell" in a segregation unit] fail to satisfy the objective
component of his Eighth Amendment conditions claim, and they do not rise to the level of a
constitutional violation.").  (*See also* Dkt. No. 43, Part 12, at 8 [Defs.' Mem. of Law, citing
cases].)

claim of inadequate prison conditions for failure to establish a deprivation that was sufficiently serious.

## 2.    Deliberate Indifference

Because I have already found that an adequate ground exists upon which to recommend the dismissal of Plaintiff's Eighth Amendment claim of inadequate prison conditions, the Court need not analyze Defendants' alternative Eighth Amendment argument that Plaintiff has failed to establish that Defendants acted with a sufficiently culpable state of mind with regard to the conditions of Plaintiff's confinement during his six-day stay in Administrative Segregation at Ulster C.F.  However, in the interest of thoroughness, I will briefly analyze that claim.

Defendants focus their argument on the fact that none of them had any control over, or even knew about, the allegedly inadequate conditions of Plaintiff's confinement during his six-day stay in Administrative Segregation.  (Dkt. No. 43, Part 12, at 7-9 [Defs.' Mem. of Law].)

Plaintiff responds with a three-part argument: (1) Defendant Hodes acted with the requisite mental state because he knew on March 12, 2004, that Plaintiff had a DOCS-issued beard exemption (due to his previous encounter with Plaintiff in late 2003); (2) Defendants Craft and O'Keefe acted with the requisite mental state because they recklessly failed to take the easy step of checking if he had a beard exemption; and (3) each Defendant, after causing Plaintiff to be confined to Administrative Segregation, failed to "[]check[]" up on him there.  (Dkt. No. 48, at 16-17 [Pages 15 and 16 of Plf.'s Response Mem. of Law].)

I can find no record evidence that any Defendant knew of the allegedly inadequate prison conditions that Plaintiff would experience in Administrative Segregation at Ulster C.F. before they caused Plaintiff to be confined there.  Furthermore, I know of no case law that imposes on a

correctional official who charges an inmate with a disciplinary offense a duty to "check up" on

that inmate once he is confined to administrative segregation, or that deems that official to be

*reckless* if he fails to check up on that inmate.

Plaintiff may have adduced some evidence that Defendants Hodes and O'Keefe turned a

blind eye to the written exemption inside the top of his "draft bag" upon his arrival at Ulster C.F.

on March 12, 2004.  (Dkt. No. 43, Part 3, at 17-28 [Ex. A to McCartin Decl., attaching Plf.'s

depo. trans.].)  However, that evidence does not constitute evidence that Defendants Hodes and

O'Keefe possessed a reckless mental state with regard to the prison conditions that Plaintiff

would experience in Administrative Segregation at Ulster C.F.

For these reasons, I recommend that, in the alternative, the Court dismiss Plaintiff's

Eighth Amendment claim of inadequate prison conditions for failure to establish that Defendants

acted with a sufficiently culpable state of mind with regard to the conditions of Plaintiff's

confinement during his six-day stay in Administrative Segregation at Ulster C.F.

> ### C.    Whether Plaintiff's First Amendment Retaliation Claim Should Be Dismissed Because He Failed to Establish that the Adverse Action Allegedly Taken Against Him Was Anything More than *De Minimis* in Nature

Claims of retaliation like those asserted by Plaintiff find their roots in the First

Amendment.  *See Gill v. Pidlypchak*, 389 F.3d 379, 380-81 (2d Cir. 2004).  Central to such

claims is the notion that in a prison setting, corrections officials may not take actions which

would have a chilling effect upon an inmate's exercise of First Amendment rights.  *See Gill*, 389

F.3d at 381-383.  Because of the relative ease with which claims of retaliation can be incanted,

however, courts have scrutinized such retaliation claims with particular care.  *See Flaherty v.*

*Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983).  As the Second Circuit has noted,

> [t]his is true for several reasons.  First, claims of retaliation are
> difficult to dispose of on the pleadings because they involve questions
> of intent and are therefore easily fabricated.  Second, prisoners' claims
> of retaliation pose a substantial risk of unwarranted judicial intrusion
> into matters of general prison administration.  This is so because
> virtually any adverse action taken against a prisoner by a prison
> official--even those otherwise not rising to the level of a constitutional
> violation--can be characterized as a constitutionally proscribed
> retaliatory act.

*Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001) (citations omitted), *overruled on other grounds*, *Swierkewicz v. Sorema N.A.*, 534 U.S. 506 (2002).

To prevail on a First Amendment claim under 42 U.S.C. § 1983, a Plaintiff must prove by the preponderance of the evidence that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff–namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action--in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff.  *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Gill*, 389 F.3d at 380 (citing *Dawes v. Walker*, 239 F.3d 489, 492 [2d. Cir. 2001]).  Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone.  *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) [citations omitted].

Defendants focus their First Amendment argument on the assertedly *de minimis* nature of the adverse action, the fact that it was not accompanied by any threat of future such adverse action, and the fact that Plaintiff subjectively expected that the adverse action would be brief (at the time it was taken).  (Dkt. No. 43, Part 12, at 12-15 [Defs.' Mem. of Law].)  In response,

24

Plaintiff focuses on, among other things, the nature of the deprivations he unjustifiably experienced during his confinement in Administrative Segregation.  (Dkt. No. 48, at 18-19 [Pages 17 and 18 of Plf.'s Response Mem. of Law].)

In making their argument, Defendants attempt to distinguish the facts of the current case from the facts of a Second Circuit case finding that a question of fact existed as to the *de minimis* nature of a nine-day keeplock confinement, *which was accompanied by threat of future misbehavior reports.  See Gill v. Tuttle*, 93 F. App'x 301, 303 (2d Cir. 2004).  I agree that this sort of additional adverse action by a defendant is an adequate ground upon which to distinguish *Gill v. Tuttle* and similar cases.[52]  Granted, I have found some district court cases (from within the Second Circuit) ruling that a question of fact existed as to the *de minimis* nature of keeplock confinements that do not appear to have been accompanied by such additional adverse action.[53] However, the keeplock confinements in those cases were somewhat longer than was the keeplock

---

[52]     *See, e.g., Keesh v. Goord*, 04-CV-0271, 2007 WL 2903682, at *10 (W.D.N.Y. Oct. 1, 2007) (question of fact existed as to *de minimis* nature of Correction Officer Ekpe's keeplock confinement of plaintiff for one day, during which, according to the record evidence [specifically, Plf.'s Ex. 9], Correction Officer Ekpe "may have . . . deprived [plaintiff] of meals") [citations omitted]; *see also Keesh v. Goord*, 04-CV-0271, Verified Complaint, ¶ "IV.W." (W.D.N.Y. filed Apr. 7, 2004) (swearing that Def. Ekpe and officials "refused to provide me with my meal").

[53]     *See, e.g., Auleta v. LaFrance*, 233 F. Supp.2d 396, 402 (N.D.N.Y. 2002) (Kahn, J.) ("At this stage of the action [i.e., the pleading stage], Plaintiff's claim that he was placed in keeplock for 7 ½ days is properly construed as alleging adverse action") [citations omitted]; *Bartley v. Collins*, 95-CV-10161, 2006 U.S. Dist. LEXIS 28285, at *22 (S.D.N.Y. May 12, 2006) ("Collins's second misbehavior report against plaintiff did constitute adverse action because it caused plaintiff to be placed in keeplock confinement for ten days.") [citations omitted]; *Wells v. Wade*, 96-CV-1627, 2000 WL 1239085, at *4 (S.D.N.Y. Aug. 31, 2000) ("[A] rational trier of fact could find that the filing of a frivolous misbehavior report that resulted in thirteen days of pre-hearing 'keeplock' confinement would be likely to chill a person of ordinary firmness from continuing to engage in activity protected by the First Amendment: namely, pursuing a prison grievance.") [internal quotations omitted].

confinement in this action.

I have also found some cases in which a plaintiff was taken to a Special Housing Unit ("S.H.U."), as was Plaintiff in the current action.[54]  These cases suggest that, generally, a *transfer* to a housing unit may be a type of adverse action that is more than *de minimis*.[55]  However, these cases too appear to be somewhat distinguishable because they invariably involve a formal *transfer* (i.e., change in residence) to a Special Housing Unit for a long period of time.[56]

Here, there was no long-term transfer to the Ulster C.F. S.H.U.  Rather, Plaintiff was taken to the Ulster C.F. S.H.U. (during his transportation through Ulster C.F.) for what was intended to be, and what Plaintiff *understood* would be, a brief period of time.[57]  There is no

---

[54]     (*See* Dkt. No. 43, Part 11, ¶ 12 [Defs.' Rule 7.1 Statement, asserting that Plaintiff was "place[d] in administrative segregation status in the Special Housing Unit . . . at Ulster Correctional Facility . . . ."]; Dkt. No. 43, Part 9, ¶¶ 8, 10 [O'Keefe Decl., stating that "I was directed to have the plaintiff taken to SHU on administrative segregation status . . ." and "plaintiff was placed in the SHU on March 12, 2004 . . ."].)

[55]     *See Allah v. Poole*, 506 F. Supp.2d 174, 187 (W.D.N.Y. 2007) ("C]ourts have held that transfers to other facilities or housing units can satisfy the adverse-action requirement . . . .") [collecting cases]; *Chavis v. Struebel*, 317 F. Supp.2d 232, 238-39 (W.D.N.Y. 2004) ("[T]ransferring an inmate to another housing unit or to a psychiatric facility . . . satisfies the adverse action requirement.") [citations omitted].

[56]     *See, e.g., Walker v. Pataro*, 99-CV-4607, 2002 WL 664040, at *8-9 (S.D.N.Y. Apr. 23, 2002) (question of fact exists as to *de minimis* nature of permanent transfer to different housing unit in general population, which resulted in loss of higher-paying prison job).

[57]     (Dkt. No. 43, Part 9, ¶ 8 [O'Keefe Decl., swearing that "After I contacted the facility Watch Commander on March 12, 2004 and informed him of the circumstances, I was directed to have the plaintiff taken to SHU on administrative segregation status until plaintiff's file could be reviewed and it could be determined whether plaintiff was correctly stating that he had an exemption for his beard.  The Inmate Records Coordinator was going to be the individual to check the records."]; Dkt. No. 43, Part 3, at 18, 22-23 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans., stating that, during the time in question, he was being "transported through Ulster [C.F.]" on his way back from "court appearances in New York City"]; Dkt. No. 43, Part 3, at 45 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans., stating that he did not write a letter before

26

admissible record evidence that Defendants *knew* the duration of, or (allegedly) substandard

conditions of, the confinement that Plaintiff would ultimately experience in the Ulster C.F.

S.H.U.[58]  Moreover, there is no admissible record evidence that Plaintiff ended up staying in

S.H.U. for six days *because of* the acts of Defendants O'Keefe or Craft (or any Defendant).[59]

Rather, the admissible record evidence suggests that the delay in Plaintiff's release from S.H.U.

was caused by (1) the delay of the Inmate Records Coordinator in reviewing Plaintiff's file

(presumably in DOCS' Central Files) to determine whether he was correctly stating that he had an

---

March 17, 2004, "because I figure I would have been out of the box before this because they
would have verified that I had a permit but apparently that didn't happen."].)

      [58]     (Dkt. No. 43, Part 8, ¶¶ 7-11 [Craft Decl.]; Dkt. No. 43, Part 9, ¶¶ 8, 10-11
[O'Keefe Decl.]; Dkt. No. 43, Part 10, ¶¶ 10, 12-13 [Hodes Decl.]; Dkt. No. 43, Part 3, at 40 [Ex.
A to McCarin Decl., attaching Plf.'s depo. trans.]; *see also* Dkt. No. 48, Plf.'s Rule 7.1 Response,
¶ 15 [stating, "Plaintiff posses[es] no information or knowledge" in response to Defendants' Rule
7.1 factual assertion that "[f]rom March 12, 2004 until March 17, 2004, none of [D]efendants
w[as] responsible for the conditions of the Ulster Correctional Facility SHU while [P]laintiff was
in that SHU"].)  I note that the only role that Defendants O'Keefe and Craft played in Plaintiff's
confinement to S.H.U. was in the initial decision to take Plaintiff to S.H.U.–Defendant O'Keefe
recommending that Plaintiff be subject to Administrative Segregation, and Defendant Craft
authorizing Plaintiff's pre-hearing confinement to Administrative Segregation.  (Dkt. No. 43, Part
9, ¶ 8 [O'Keefe Decl., swearing, "After I contacted the facility Watch Commander on March 12,
2004 and informed him of the circumstances, I was directed to have the plaintiff taken to SHU on
administrative segregation status . . . ."]; Dkt. No. 9, at 18 [Ex. 1 to Plf.'s Verified Am. Compl.,
attaching copy of Administrative Segregation Recommendation of March 12, 2004, authored by
Defendant O'Keefe, and authorized by Defendant Craft]; Dkt. No. 9, ¶ 7[c] [Plf.'s Verified Am.
Compl., alleging that Def. Craft "failed to . . . see why I should not be sent to the Special
Housing Unit [and] he never verified that I had or had not an exemption from cutting my beard . .
. ."]; Dkt. No. 43, Part 10, ¶ 10 [Hodes Decl., swearing, "I played no role in a decision to place
plaintiff into administrative segregation in the Ulster SHU.  That decision was made by others. . .
."].)

      [59]     (*See* Dkt. No. 43, Part 10, ¶ 12 [Hodes Decl., swearing, "Once plaintiff was placed
in the SHU on March 12, 2004, I had no further contact with him."]; Dkt. No. 43, Part 9, ¶ 10
[O'Keefe Decl., swearing, "Once plaintiff was placed in the SHU on March 12, 2004, I had no
further contact with him."]; Dkt. No. 43, Part 8, ¶ 11 [Craft Decl., swearing that, during
Plaintiff's confinement to S.H.U., he had no involvement in the conditions of that confinement].)

exemption for his beard, and/or perhaps (2) Plaintiff's own delay in sending a letter to his

Administrative Segregation hearing officer regarding his release.[60]

As a result, I find some guidance in a case from the U.S. District Court for the Western

District of New York that recently recognized the rather common-sense point of law that, when

considering whether or not adverse action is *de minimis* for purposes of a First Amendment

retaliation claim, it is appropriate for a court to focus on the adverse action *caused by the*

*defendant or defendants in question* (rather than whatever bad things happened to the plaintiff

following the taking of adverse action by the defendant or defendants).  In *Coleman v. Sutton*, a

prison doctor transferred a prisoner to the prison's infirmary, where–because of the prisoner's

own refusal to stay in the infirmary–he was then transferred to the prison's Special Housing Unit.

*Coleman v. Sutton*, 530 F. Supp.2d 451, 452-53 (W.D.N.Y. 2008).  The Western District held

that the prisoner's transfer to S.H.U. was not sufficiently adverse to constitute adverse action (for

purposes of the prisoner's First Amendment retaliation claim against the correctional officer)

since that transfer was caused not by the correctional officer but by the plaintiff's own refusal to

---

[60]        (Dkt. No. 43, Part 9, ¶ 8 [O'Keefe Decl., swearing, "I was directed to have the
plaintiff taken to SHU on administrative segregation status until plaintiff's file could be reviewed
and it could be determined whether plaintiff was correctly stating that he had an exemption for
his beard.  The Inmate Records Coordinator was going to be the individual to check the records.
. . .]; Dkt. No. 9, at 18 [Plf.'s Verified Am. Compl., attaching copy of Administrative Segregation
Recommendation of March 12, 2004, authored by Defendant O'Keefe, and authorized by
Defendant Craft, indicating that Plaintiff would be "confined pending a determination on [the]
recommendation," a hearing would "be conducted within 14 days of [the] recommendation," and
that Plaintiff could "write to the Deputy Superintendent for Security or his/her designee prior to
the hearing to make a statement on the need for continued confinement"]; Dkt. No. 43, Part 3, at
45-47 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans., stating that he did not write a letter
before March 17, 2004, "because I figure I would have been out of the box before this because
they would have verified that I had a permit but apparently that didn't happen.  And, so,
. . . I wrote that letter to [the Lieutenant or Hearing Officer who would be conducting his
Administrative Segregation Hearing] and I gave it to the Officer for mailing."].)

stay in the prison's infirmary.  *Coleman*, 530 F. Supp.2d at 453.

Here, as in *Coleman*, while Plaintiff's *initial placement* in S.H.U. was caused by Defendants O'Keefe and Craft, Plaintiff's stay there *for six days* was caused not by those Defendants but by other events.  Under the circumstances, I can find no record evidence that Plaintiff's being taken to S.H.U. pending the Ulster C.F. Inmate Records Coordinator's review of Plaintiff's file (to determine whether he was correctly stating that he had an exemption for his beard) was an action that was sufficiently adverse to deter a similarly situated individual of ordinary firmness from exercising his constitutional rights (i.e., by continuing to wear a beard of more than an inch in length as a tenet of his Rastafarian religion).

For these reasons, I recommend that, in the alternative, the Court dismiss Plaintiff's First Amendment retaliation claim because he has failed to establish that the adverse action allegedly taken against him was anything more than *de minimis* in nature.

> **D.**    **Whether, in the Alternative, Plaintiff's Claims Against Defendants Goord and Craft Should Be Dismissed Because Plaintiff Has Failed to Establish that They Were Personally Involved in the Constitutional Violations Alleged**

Because I have already concluded that no constitutional violations occurred in which any Defendant (including Defendants Goord and Craft) could have been personally involved, the Court need not analyze Defendants' alternative argument that Plaintiff's claims against Defendants Goord and Craft be dismissed because Plaintiff has failed to establish that they were personally involved in the constitutional violations alleged.  However, in the interest of thoroughness, I will analyze that argument (and assume, for the sake of argument, that constitutional violations did occur in which they could have been personally involved).

"'[P]ersonal involvement of defendants in alleged constitutional deprivations is a

29

prerequisite to an award of damages under § 1983.'" *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 [2d Cir. 1991]).[61]  In order to prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the alleged unlawful conduct and the defendant.[62]  If the defendant is a supervisory official, such as a DOCS Commissioner or Deputy Commissioner, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior*) is insufficient to show his or her personal involvement in that unlawful conduct.[63]  In other words, supervisory officials may not be held liable merely because they held a position of authority.[64]  Rather, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the alleged constitutional violation, (2) failed to remedy the violation after being informed of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing or supervising subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that constitutional violations were occurring.[65]

---

[61]     *Accord*, *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied*, 434 U.S. 1087 (1978); *Gill v. Mooney*, 824 F.2d 192, 196 (2d Cir. 1987).

[62]     *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

[63]     *Polk County v. Dodson*, 454 U.S. 312, 325 (1981); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at 501; *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985).

[64]     *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996).

[65]     *Iqbal v. Hasty*, 490 F.3d 143, 152 (2d Cir. 2007) (setting forth five prongs); *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (adding fifth prong); *Wright v. Smith*, 21 F.3d 496,

### 1.      Defendant Goord

In their Rule 7.1 Statement, Defendants have asserted that "Defendant Goord was not personally involved in any of the actions that lead to the plaintiff's confinement in the Ulster Correctional Facility SHU from March 12, 2004 until March 17, 2004," supporting that assertion with a record citation.  (Dkt. No. 43, Part 11, ¶ 23 [Defs.' Rule 7.1 Statement, citing pages 28-29 of Plaintiff's depo. trans.].)  Setting aside the fact that Defendants' assertion is too much like a conclusion of law, I find that the deposition transcript to which they cite does not go so far as to say that Defendant Goord "was not personally involved" in the constitutional violations alleged. (Dkt. No. 43, Part 3, at 28-31 [Ex. A to McCartin Decl., attaching Plf.'s depo. trans.].)

Rather, fairly and reasonably read, Plaintiff's deposition transcript says that Defendant Goord's involvement was limited to the fact that (1) he had (presumably) created two conflicting rules and/or policies (i.e., a rule or policy requiring a prisoner to physically possess on his person his written beard-exemption during a prison transfer and a rule or policy prohibiting the prisoner from physically possessing property on their person during a prison transfer), and (2) he had (presumably) failed to property instruct or train his subordinates as to how to resolve that conflict without violating the prisoner's rights.  (*Id.*)  Clearly, this is meant to assert that Defendant Goord was personally involved through the third and fourth means of personal involvement described above–(1) the creation, or allowed continuance, of a policy or custom under which the violation occurred, and/or (2) gross negligence in the managing or supervising of subordinates who caused the violation.

---

501 (2d Cir. 1994) (adding fifth prong); *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986) (setting forth four prongs).

However, Defendants are correct that Plaintiff's deposition testimony contains no evidence of any other of the five sorts of personal involvement described above–(1) direct participation in the alleged constitutional violation, (2) a failure to remedy the violation after being informed of it through a report or appeal, or (3) the exhibition of deliberate indifference to the rights of inmates by failing to act on information indicating that constitutional violations were occurring.  Therefore, having established this specific fact for purposes of their summary judgment motion, Defendants were entitled to have the fact either admitted by Plaintiff or denied by him with an accurate record citation.  N.D.N.Y. L.R. 7.1(a)(3).  Plaintiff denies the assertion. (Dkt. No. 48, Plf.'s Rule 7.1 Response, ¶ 23.)  However, the only "evidence" he cites in support of that denial are those portions of his Amended Complaint, Opposition to Defendants' Motion to Dismiss for Failure to State a Claim, and Objections to my previous Report-Recommendation, wherein he "charge[d]" Defendant Goord with "actions" and "inactions" causing Plaintiff's injuries.  (*Id.*)

Such a general citation is not the "specific citation to the record where the factual issue arises" that is required by Local Rule 7.1(a)(3).  As a result, the Court need not, and I recommend that it decline to, *sua sponte* sift through the 52 pages of Plaintiff's verified Objections to my previous Report-Recommendation in a quest for a specific factual assertion by Plaintiff that Defendant Goord was personally involved in one of the three ways described in the previous paragraph of this Report-Recommendation.  (Among other things, the chance of Plaintiff having personal knowledge of such facts is extremely unlikely, in light of his other allegations.) Furthermore, Plaintiff's Opposition to Defendants' Motion to Dismiss does not constitute evidence because it was not verified.  (Dkt. Nos. 22.)  Finally, his Amended Complaint generally

may constitute evidence since it is verified.  (Dkt. No. 9.)  However, the portion of his Amended

Complaint in which he refers to Defendant Goord (in a footnote in Paragraph "7.D.") is not

sufficiently specific as to Defendant Goord's "actions and inactions" to constitute admissible

evidence based on personal knowledge to successfully oppose a motion for summary judgment.

*See* Fed. R. Civ. P. 56(e)(1) ("A supporting or opposing affidavit must be made on personal

knowledge . . . .");  *see also*, *supra*, notes 33-34 of this Report-Recommendation.

As a result, Plaintiff has effectively admitted the narrowed fact described above–that

there contains no record evidence that Defendant Goord (1) directly participated in the alleged

constitutional violation, (2) failed to remedy the violation after being informed of it through a

report or appeal, or (3) exhibited deliberate indifference to the rights of inmates by failing to act

on information indicating that constitutional violations were occurring.  I will turn, then, to

Plaintiff's theory that Defendant Goord was personally involved because he (1) created, or

allowed to continue, a policy or custom under which the violation occurred, and/or (2) was

grossly negligent in the managing or supervising of subordinates who caused the violation.

Plaintiff points to no admissible record evidence of a *DOCS-wide* rule or policy, created

or promulgated by Defendant Goord, prohibiting the prisoner from physically possessing

property on their person during a prison transfer.  (Dkt. No. 48, at 17-18 [Pages 16 and 17 of

Plf.'s Response Mem. of Law].)  Nor does Plaintiff point to any admissible record evidence of a

DOCS-wide rule or policy, created or promulgated by Defendant Goord, requiring a prisoner to

physically possess *on his person* his written beard-exemption during a prison transfer.  (*Id*.)[66]

---

[66]      I note that the written beard-exemption in question, issued by Deputy
Commissioner Lucien J. Leclaire, Jr., on December 8, 2003, merely states, "This letter should be
retained by you and will serve as your statewide beard and mustache exemption permit."  (Dkt.

Nor does Plaintiff point to any record evidence that Defendant Goord failed to properly instruct

or train his subordinates as to how to ascertain or confirm a prisoner's possession of a written

beard-exemption during a prison transfer without violating the prisoner's rights.  (*Id.*)[67]  The only

"evidence" that Plaintiff has is (1) the fact of Defendant Goord's position as the "boss of

Corrections,"[68] and the (2) occurrence of the (presumed) violation in question.  (*Id.*)  This sort of

liability (premised on the theory that a supervisor must have been liable because his subordinate

did something wrong) is precisely the sort of *respondeat superior* liability that is not allowed

under 42 U.S.C. § 1983.

### 2.    Defendant Craft

In their Rule 7.1 Statement, Defendants have asserted the following facts, in pertinent

part: (1) "[f]rom March 12, 2004 until March 17, 2004, [Defendant Craft was not] responsible for

the conditions of the Ulster Correctional Facility SHU while [P]laintiff was in that SHU"; (2)

"[f]rom March 12, 2004 until March 17, 2004, [Defendant Craft had no] interaction with

[Plaintiff] while he was in the Ulster Correctional Facility SHU"; (3) "Plaintiff never spoke to

---

No. 43, Part 6.)

[67]     For example, Plaintiff points to no admissible record evidence that incidents such as the one at issue in this action had previously occurred and been brought to Defendant Goord's attention, or that he had otherwise known of a need to instruct correctional officers on how to ascertain or confirm a prisoner's possession of a written beard-exemption during a prison transfer without violating the prisoner's rights.  In addition, I note that defense counsel asked Plaintiff in his deposition, "Do you have any evidence or reason to believe that Commissioner Goord instructs Officers not to walk ten feet away to check a draft bag to determine if the permit is available in that draft bag [as Plaintiff asserts it was in this circumstance]"  (Dkt. No. 43, Part 3, at 30 [Ex. A to McCartin Decl., attaching Plf.'s depo. trans.].)  In pertinent part, Plaintiff responded, "I don't know exactly what he instructs them . . . ."  (*Id.*)

[68]     (Dkt. No. 43, Part 3, at 28 [Ex. A to McCartin Decl., attaching Plf.'s depo. trans.].)

[D]efendant Craft from March 12, 2004 until March 17, 2004"; (4) "Plaintiff did not write to

[D]efendant Craft requesting to be released from the Ulster Correctional Facility SHU until

March 17, 2004"; (5) "Defendant Craft never received [P]laintiff's March 17, 2004 letter"; and

(6) "[o]n the same morning that [P]laintiff wrote to [D]efendant Craft, [P]laintiff was in fact

released from the Ulster Correctional Facility SHU and was transported back to Wyoming

Correctional Facility." (Dkt. No. 43, Part 11, ¶¶ 14-15, 19-22 [Defs.' Rule 7.1 Statement].)

Moreover, Defendants have supported each factual assertion with one or more accurate record

citations. (*Id*.)[69]

In his Rule 7.1 Response, Plaintiff states "[d]eny" with regard to each of the six factual

assertions listed above. (Dkt. No. 48, Plf.'s Rule 7.1 Response, ¶¶ 14-15, 19-22.) However,

Plaintiff's assertions following each of these "denials" render the denials ineffective for purposes

of Local Rule 7.1(a)(3), which requires that, in order to successfully controvert a fact asserted in

a Statement of Material Facts, the non-movant must, among other things, (1) "specifically

controvert[]" the facts in question, and/or (2) "set forth a specific citation to the record where the

factual issue arises." N.D.N.Y. L.R. 7.1(a)(3).

In particular, with regard to the first factual assertion, Plaintiff acknowledges that he

"possesses no information or knowledge to respond [to that assertion]." (*Id*. at ¶ 15.) With

regard to the second factual assertion, Plaintiff states only that Defendant *O'Keefe* spoke to an

unidentified correction officer in the Ulster C.F. S.H.U. on March 12, 2004, and in any event

---

[69]     In an apparent typographical error, I note that Defendants mistakenly cited
Paragraphs 8 through 10, rather than Paragraph 11, of Defendant Craft's declaration in support of
the first factual assertion listed above. (*See* Dkt. No. 43, Part 11, ¶ 15  [Defs.' Rule 7.1
Statement]; Dkt. No. 43, Part 8, ¶ 11 [Craft Decl.].)

Plaintiff provides no record citation in support of this assertion.  (*Id*. at ¶ 14.)  With regard to the third factual assertion, he effectively *admits* that assertion, stating, "Plaintiff never spoke to Defendant Craft."  (*Id*. at ¶ 19.)[70]  He also effectively admits the fourth factual assertion, stating that he did not write the letter in question until March 17, 2004.  (*Id*. at ¶ 20.)[71]  With regard to the fifth factual assertion, he again acknowledges that he "possesses no information or knowledge to respond [to that assertion]."  (*Id*. at ¶ 21.)

Finally, with respect to the sixth factual assertion, Plaintiff appears to take issue with only part of the factual assertion in question, asserting that he was not transported back to *Wyoming Correctional Facility* but was "placed on a DOCS bus toward *Auburn Correctional Facility*." (*Id*. at ¶ 22 [emphasis added].)  For the sake of brevity, I will set aside the evidentiary insufficiency of the documents on the docket to which Plaintiff cites in support of partial denial.

---

[70]      Apparently, Plaintiff takes issue with only the word "until" in the factual assertion contained in Paragraph 19 of Defendants' Rule 7.1 Statement, which he interprets as implying that Plaintiff did in fact speak to Defendant Craft on March 17, 2004.  (Dkt. No. 48, Plf.'s Rule 7.1 Response, ¶ 19.)  If so, I find that this controversy can be eliminated by simply construing Defendants' factual assertion as reading "Plaintiff never spoke to [D]efendant Craft from March 12, 2004 *through* March 17, 2004," which is clearly the fact that Defendants are intending to assert.  (*See* Dkt. No. 43, Part 3, at 28 [Ex. A to McCartin Decl., attaching Plf.'s depo. trans.]; Dkt. No. 43, Part 8, ¶¶ 8-10 [Craft Decl.].)

[71]      Again, apparently, Plaintiff takes issue with only part of the factual assertion in question, asserting that he addressed the letter to the "Lt./Hearing Officer," and not to Defendant Craft.  (Dkt. No. 48, Plf.'s Rule 7.1 Response, ¶ 20.)  If so, I find that he cites no record evidence controverting his deposition testimony that he *intended* the letter to go to Defendant Craft.  (Dkt. No. 43, Part 3, at 45-47 [Ex. A to McCartin Decl., attaching Plf.'s depo. trans., stating, "I . . . did write the Lieutenant Craft.  I don't . . . think at the time I remembered his name.  But Sergeant O'Keefe did mention . . . Lieutenant Craft. . . .  I don't think I wrote Lieutenant Craft specifically. But, I did write [the letter to the] Lieutenant because I knew it was a Lieutenant."].)  In any event, I find that any factual dispute about this narrow issue is immaterial, since the crux of Defendants' factual assertion is clearly that Plaintiff did not write a letter to Defendant Craft requesting to be released from the S.H.U. until March 17, 2004, *if ever*.

(*Id.*)  Rather, I find that the limited fact that Plaintiff is denying is immaterial to Defendants'
motion and thus can be disregarded by the Court.

As a result, pursuant to Local Rule 7.1(a)(3), the following five facts are undisputed for
purposes of Defendants' motion: (1) from March 12, 2004, until March 17, 2004, Defendant
Craft was not responsible for the conditions of the Ulster C.F. S.H.U. while Plaintiff was in that
S.H.U.; (2) from March 12, 2004, until March 17, 2004, Defendant Craft had no interaction with
Plaintiff while he was in the Ulster C.F. S.H.U.; (3) Plaintiff never spoke to Defendant Craft
from March 12, 2004, through March 17, 2004; (4) Plaintiff did not write to Defendant Craft
requesting to be released from the Ulster C.F. S.H.U. until March 17, 2004, if ever; (5)
Defendant Craft never received Plaintiff's March 17, 2004, letter; and (6) on the same morning
that Plaintiff wrote his March 17, 2004, letter, Plaintiff was in fact released from the Ulster C.F.
S.H.U.

Based on these undisputed facts, and based on the lack of record evidence establishing
any involvement of Defendant Craft in the conditions of confinement that Plaintiff experienced
in the Ulster C.F. S.H.U., I find that no rational fact-finder could conclude that Defendant Craft
was personally involved in the Eighth Amendment violation alleged by Plaintiff.[72]  I make the
same finding with regard to Plaintiff's Fourteenth Amendment due process claim because (even
assuming Plaintiff possessed a right of procedural due process arising from his six-day
confinement in S.H.U.) he was afforded all the process that was due from Defendant Craft under

---

[72]     I note that, as I stated in Part III.B.2. of this Report-Recommendation, I know of
no case law that imposes on a correctional official who charges an inmate with a disciplinary
offense a duty to "check up" on that inmate once he is confined to administrative segregation, or
that deems that official to be *reckless* if he fails to check up on that inmate.

the circumstances in that (1) no record evidence exists that Plaintiff did not properly receive

notice of the Administrative Segregation Recommendation,[73] and (2) Plaintiff was entitled to a

hearing only within *14 days* of Defendant O'Keefe's signing of the Administrative Segregation

Recommendation on March 12, 2004.[74]  However, I have trouble making the same finding with

regard to Plaintiff's First Amendment retaliation claim, because record evidence exists that

Defendant Craft was the individual who signed the Administrative Segregation Recommendation

(submitted by Defendant O'Keefe on March 12, 2004) authorizing Plaintiff's confinement in

S.H.U. pending a hearing to be conducted within 14 days of the recommendation.[75]

     For these reasons, I recommend, in the alternative, as follows: (1) that all of Plaintiff's

---

[73]    (Dkt. No. 9, at 18 [Ex. 1 to Plf.'s Verified Am. Compl., attaching copy of Administrative Segregation Recommendation of March 12, 2004, containing paragraph at bottom labeled, "**Notice to Inmate**"] [emphasis in original]; *cf.* Dkt. No. 43, Part 3, at 27-28, 45 [Ex. A to McCartin Decl., attaching Plf.'s depo. trans., stating that, before Plf. was brought to the Ulster C.F. S.H.U., Def. Craft orally informed Plf. to write to Def. Craft if he "wanted to get out of the box or not go in the box"].)

[74]    (Dkt. No. 9, at 18 [Ex. 1 to Plf.'s Verified Am. Compl., attaching copy of Administrative Segregation Recommendation of March 12, 2004, stating, in pertinent part, "A hearing will be conducted within 14 days of this recommendation in accordance with the provisions of Part 254 of Chapter V."]; Dkt. No. 43, Part 8, ¶ 3 [Craft Decl.].)  *See also* 7 N.Y. Comp. Codes R. & Regs. § 301.4(a) ("This hearing [conducted pursuant to Part 254] shall be conducted with 14 days of an inmate's admission to administrative segregation, after issuance of an administrative segregation recommendation made by the employee who ascertained the facts or circumstances.").

[75]    (Dkt. No. 9, at 18 [Ex. 1 to Plf.'s Verified Am. Compl., attaching copy of Administrative Segregation Recommendation of March 12, 2004, authored by Defendant O'Keefe, and authorized by Defendant Craft]; *cf.* Dkt. No. 9, ¶ 7[c] [Plf.'s Verified Am. Compl., asserting that Def. Craft "failed to . . . see why I should not be sent to the Special Housing Unit [and] he never verified that I had or had not an exemption from cutting my beard . . . ."]; Dkt. No. 43, Part 9, ¶ 8 [O'Keefe Decl., swearing, "After I contacted the facility Watch Commander on March 12, 2004 and informed him of the circumstances, I was directed to have the plaintiff taken to SHU on administrative segregation status . . . ."].)

claims against Defendant Goord be dismissed because Plaintiff has failed to establish that he was

personally involved in the constitutional violations alleged; and (2) that only Plaintiff's Eighth

and Fourteenth Amendment claims be dismissed against Defendant Craft because Plaintiff has

failed to establish that he was personally involved in the constitutional violations alleged.

> ### E. Whether, in the Alternative, Plaintiff's Claims Against all Defendants Should Be Dismissed Because, Based on the Current Record, They Are Protected from Liability by the Doctrine of Qualified Immunity, as a Matter of Law

Because I have already found that adequate grounds exist upon which to recommend the

dismissal of Plaintiff's claims, the Court need not analyze Defendants' alternative argument that

Plaintiff's claims against all Defendants should be dismissed because, based on the current

record, Defendants are protected from liability by the doctrine of qualified immunity, as a matter

of law.  (Dkt. No. 43, Part 12, at 15-17 [Defs.' Mem. of Law].)  As a result, I do not analyze

Defendants' argument other than to make one point.

In my Report-Recommendation of January 30, 2007, addressing Defendants' motion to

dismiss for failure to state a claim, I stated, "I believe that a credible argument might be made by

Defendants that the law [as to whether a DOCS-issued exemption from the one-inch beard rule

was effective, or whether a court order was required] was not clearly established [on March 12,

2004], giving rise to a qualified immunity defense."  (Dkt. No. 24, at 31-32 & nn. 84-84.)  As

explained in that Report-Recommendation, I made that statement based on the case of *Young v.

Goord*, in which the U.S. District Court for the Eastern District of New York traced the

"alternat[ing]" law between November 16, 1993, and February 5, 2001, with regard to whether a

DOCS "exemption" or a "court order" was necessary to excuse an inmate from the effects of

DOCS' one-inch beard rule.  *Young v. Goord*, 01-CV-0626, 2005 WL 562756, at *2-6 (E.D.N.Y.

March 10, 2005), *aff'd*, 192 F. App'x 31 (2d Cir. Aug 2, 2006) (unpublished decision cited only

to show case's subsequent history).  In their argument regarding qualified immunity, Defendants

have cited no case after *Young*, suggesting that the law continued to alternate after February 5,

2001.  (Dkt. No. 43, Part 12, at 15-17 [Defs.' Mem. of Law].)[76]  As a result, I have no reason to

believe that that point of law was not clearly established by March 12, 2004.

### F.     Whether, in the Alternative, Plaintiff's Action Should Be Dismissed Under Local Rule 41.2(b) Because of His Failure to Keep the Court Apprised of His Current Address

Defendants argue that, in the alternative, Plaintiff's action should be dismissed under

Local Rule 41.2(b) because (1) he was released from DOCS' custody on November 13, 2007, (2)

since November 13, 2007, and the date of Defendants' motion, January 23, 2008, Plaintiff had

failed to notify the Court of his current address, and (3) this failure has caused the Court's mail to

Plaintiff (specifically, the Court's receipt of Plaintiff's partial payment of the Court filing fee) to

be returned as undeliverable on November 20, 2007.  (Dkt. No. 43, Part 12, at 17-18 [Defs.'

Mem. of Law]; Dkt. No. 43, Part 11, ¶ 26 [Defs.' Rule 7.1 Statement].)  Defendants are correct in

the above recitation of events.  Indeed, an additional mailing from the Court to Plaintiff was

returned as undeliverable on January 7, 2008, due to Plaintiff's failure to promptly notify the

Court of his change in address upon release from DOCS.  (Dkt. Nos. 42.)

However, on January 17, 2008, Plaintiff resurfaced in the Bergan County Jail in

Hackensack, New Jersey, and by letter notified the Court of his change in address.  (Dkt. No. 45.)

In his letter, Plaintiff explained that, immediately upon his release from DOCS, he was taken into

---

[76]     Indeed, *Young* stated that the DOCS Directive issued on February 5, 2001, "remain[s] in force" as of the date of the decision, which was March 10, 2005.  *Young*, 2005 WL 562756, at *6.

custody by the Department of Homeland Security and "placed in [i]mmigration proceedings,"

wherein he was (allegedly) denied access to his legal work and materials necessary to write to the

Court.  (*Id*.)  Plaintiff repeats these assertions in his sworn declaration in opposition to

Defendants' motion.  (Dkt. No. 48, Plf.'s Decl. in Opp., ¶¶ 2-4.)  Defendants have submitted no

reply to Plaintiff's response.  In addition, I can find only minimal prejudice to the Court and

Defendants due to Plaintiff's two-month delay, under the circumstances.

For these reasons, I find that Plaintiff's two-month failure to keep the Court notified of his

current address is not an appropriate ground upon which to dismiss his Amended Complaint.

Rather, Plaintiff's Amended Complaint should be dismissed for the reasons (and alternative

reasons) discussed above in Parts III.A. through III.D. of this Report-Recommendation.

**ACCORDINGLY**, it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 43) be

**GRANTED**.

**ANY OBJECTIONS to this Report-Recommendation must be filed with the Clerk**

**of this Court within TEN (10) WORKING DAYS, PLUS THREE (3) CALENDAR DAYS**

**from the date of this Report-Recommendation (unless the third calendar day is a legal**

**holiday, in which case add a fourth calendar day)**.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P.

72(b); N.D.N.Y. L.R. 72.1(c); Fed. R. Civ. P. 6(a)(2), (d).

**BE ADVISED that the District Court, on *de novo* review, will ordinarily refuse to**

**consider arguments, case law and/or evidentiary material that could have been, but were**

41

not, presented to the Magistrate Judge in the first instance.[77]

BE ALSO ADVISED that the failure to file timely objections to this Report-

Recommendation will PRECLUDE LATER APPELLATE REVIEW of any Order of

judgment that will be entered. *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small*

*v. Sec'y of H.H.S.*, 892 F.2d 15 [2d Cir. 1989]).

Dated: July 24, 2008
      Syracuse, New York

*George H. Lowe*

George H. Lowe
United States Magistrate Judge

---

[77]     *See, e.g., Paddington Partners v. Bouchard*, 34 F.3d 1132, 1137-38 (2d Cir. 1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40 n.3 (2d Cir. 1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *Alexander v. Evans,* 88-CV-5309, 1993 WL 427409, at *18 n.8 (S.D.N.Y. Sept. 30, 1993) (declining to consider affidavit of expert witness that was not before magistrate) [citation omitted]; s*ee also Murr v. U.S.*, 200 F.3d 895, 902, n.1 (6th Cir. 2000) ("Petitioner's failure to raise this claim before the magistrate constitutes waiver."); *Marshall v. Chater*, 75 F.3d 1421, 1426 (10th Cir. 1996) ("Issues raised for the first time in objections to the magistrate judge's recommendations are deemed waived.") [citations omitted]; *Cupit v. Whitley*, 28 F.3d 532, 535 (5th Cir. 1994) ("By waiting until after the magistrate judge had issued its findings and recommendations [to raise its procedural default argument] . . . Respondent has waived procedural default . . . objection[].") [citations omitted]; *Greenhow v. Sec'y of Health & Human Servs.*, 863 F.2d 633, 638-39 (9th Cir. 1988) ("[A]llowing parties to litigate fully their case before the magistrate and, if unsuccessful, to change their strategy and present a different theory to the district court would frustrate the purpose of the Magistrates Act."), *overruled on other grounds by U.S. v. Hardesty*, 977 F.2d 1347 (9th Cir. 1992); *Patterson-Leitch Co. Inc. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985, 990-91 (1st Cir. 1988) ("[A]n unsuccessful party is not entitled as of right to de novo review by the judge of an argument never seasonably raised before the magistrate.") [citation omitted].